Alan Birnbaum
15830 Far View Place
Anchorage, AK 99516
907-522-2232
alanjbirnbaum@alaska.gov
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| RUTH DUKOFF AND ALAN BIRNBAUM | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MUNICIPALITY OF ANCHORAGE, | ) | |
| BOARD OF ADJUSTMENT OF THE | ) | |
| MUNICIPALITY OF ANCHORAGE, AND | ) | |
| PLATTING BOARD OF THE | ) | |
| MUNICIPALITY OF ANCHORAGE. | ) | |
| | ) | |
| Defendants. | ) | Case No. 3:22-cv-00007-SLG |
| _____ | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF,
AND COMPENSATORY DAMAGES AND DEMAND FOR JURY TRIAL**
(U.S. Const. 14th Amend.; 28 U.S.C. §§ 1367 and 2201; 42 U.S.C. §§ 1983 and 1988;
AMC 1.15.060, 21.03.020, 21.03.200, 21.03.240, 21.07.060, 21.08.030, 23.45.D107.1;
AMCR 21.11.302, 21.11.304, 21.11.306, 21.20.003, 21.90.003)

Plaintiffs Ruth Dukoff and Alan Birnbaum (Plaintiffs) hereby bring this civil

action against the above-identified Defendants for declaratory and injunctive relief and

for compensatory damages. Plaintiffs allege as follows:

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                    Page 1 of 77

# INTRODUCTION

1.     This action seeks declaratory and injunctive relief and compensatory damages because of Defendants' violations of the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution and, pursuant to this Court's supplemental jurisdiction, of certain laws of the Municipality of Anchorage (Anchorage) that protect Plaintiffs' lives and property, especially in the event of a wildfire. Plaintiffs' constitutional rights were violated because of the bias of the members of the Anchorage Platting Board and Anchorage Board of Adjustment in favor of the largest developer of houses in Alaska, and the violations of the laws of Anchorage were the product of and are evidence of that bias.

# JURISDICTION AND VENUE

2.     Because this action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' Fourteenth Amendment rights, pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has jurisdiction over the subject matter and the parties.

3.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims that Defendants violated municipal laws. Those claims arise in connection with and are evidence of the federal claims and, therefore, share common operative facts with the federal claims. Accordingly, the federal and municipal claims are part of the same case or controversy under Article III of the United States Constitution. The parties for all claims are identical. Resolving the federal and municipal claims in a single action

will serve the interests of judicial economy, convenience, consistency, and fairness to the parties.

4.     Pursuant to 28 U.S.C. § 1391, venue is proper in and Defendants are subject to the personal jurisdiction of this Court. Defendants reside and all of the events or omissions giving rise to the federal and municipal claims occurred in the District of Alaska.

## PARTIES

5.     Plaintiffs Alan Birnbaum and Ruth Dukoff are individuals who reside at 15830 Far View Place, Anchorage, Alaska 99516.

6.     Defendant Anchorage is a unified home rule municipality in the State of Alaska responsible for the safety and welfare of the residents of Anchorage, Alaska. Anchorage's address is 632 West 6th Avenue, Anchorage, Alaska 99501.

7.     Defendant Platting Board is an Anchorage board that, among other things, has decision-making authority over preliminary plats, including amendments to preliminary plats, and certain variances. The Platting Board's address is 632 West 6th Avenue, Anchorage, Alaska 99501.

8.     Defendant Board of Adjustment is an Anchorage board that decides appeals from Platting Board decisions regarding preliminary plats, including amendments to preliminary plats, and certain variances. The Board of Adjustment's address is 632 West 6th Avenue, Anchorage, Alaska 99501.

## FACTS

<u>Anchorage Hillside Fire Risk and the Need for Secondary Access Roads</u>

9.    Wildfires and other natural disasters, such as earthquakes, are a threat to the lives and property of the residents of the Anchorage Hillside. In the event of a wildfire or other natural disaster, only an evacuation may save lives.

10.    The U.S. Forest Service has declared Anchorage "a community-at-risk for wildfire," and the Municipality has found that "[t]he entire MOA has the potential for wildfires." (R132; R130) And Hillside residents are particularly at risk of loss of life from a wildfire given (among other things) the surrounding wilderness and the steep topography. The Anchorage Fire Department has noted, for example, that "[w]here the Miller's Reach Fire of 1996 spread across mostly flat terrain and still burned more than 400 structures, a wildfire in South Anchorage would spread even faster because fire spread rates increase with slope." (R129) Anchorage has noted that the Hillside District Plan's emergency services goals include "[p]lan for emergency evacuation by ensuring that all residents have adequate egress from their neighborhood." (R135)

11.    In areas served by a single access road, such as Sandpiper Drive, in the event of an emergency such as a wildfire, residents may die because the road is impassable, making evacuation impossible. In the event of other emergencies, such as a medical emergency, where residents need to reach a hospital or first responders need to

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 4 of 77

reach residents, residents may die because the road is impassable because of, for example, snow, ice, or fallen trees.

12.     A 2006 Hillside Subarea Transportation Study prepared for the Traffic Department states future development of subdivisions above Golden View Drive must provide secondary access. The study reports that a technical advisory group comprised of persons including developers and municipal staff all recognized the need for a secondary access road in this area.

13.     The Anchorage Municipal Assembly (Assembly) has recognized the threat to the lives and property of residents who live in an area served by a single access road. On November 19, 2019, the Assembly passed and approved AO No. 2019-136, As Amended. AO No. 2019-136 concerns the construction and maintenance of "life/safety access roads." It emphasizes the following: "there are several areas of the municipality that fire, emergency medical, and private vehicles can only access, or evacuate, by a single route, some of which are sub-standard for emergency vehicles"; "to promote public safety, the 2012 International Fire Code, adopted by the Municipality, requires that new '[d]evelopments of one or two-family dwellings where the number of dwelling units exceeds 30 shall be provided with two separate and approved fire apparatus access roads' [Anchorage Municipal Code (AMC) 23.45.D107.1]"; and "the McHugh Creek wildfire in 2016 and the MLK/Campbell Park wildfire in 2019 have again underscored the need for areas of the municipality to be served by at least two access routes." (R497)

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 5 of 77

14.     In submitting AO No. 2019-136, the mayor noted that "this is a 'legacy' problem: the municipality would not permit some of these developments to be constructed today." (R498)

15.     One of the goals of the Hillside District Plan is to improve emergency access and egress.

<u>The Area above Luna and Elizabeth Streets</u>

16.     The single access road that serves the area above Luna Street is approximately 1.4 miles long. Above Elizabeth Street, the road is approximately 1.5 miles long. The road is steep. The road is narrow. The road is sloped. The road has hairpin turns. The road is hazardous. Tony Hoffman of The Boutet Company, Inc., a representative of Mr. Andre Spinelli—a vice-president and partial owner of Spinell Homes, Inc. (Spinell)—stated, "The condition of the road and slopes in the hairpin corners will require areawide redesign." (R336) Mr. Hoffman stated that Mr. Spinelli "acknowledges that the condition of Sandpiper is hazardous for pedestrians and motorists alike, and is looking into potential fixes." (R336)

17.     Nothing in the Record states that the single access road that serves the area above Luna is a "fire apparatus access road" as that term is defined in AMC 23.45.D107.1. (In this Complaint, any reference to the "Record" is to the record that was before the Board of Adjustment in Plaintiffs' appeal of S12599.)

18.     Many, if not most, dwelling units in the area above Elizabeth do not have automatic sprinkler systems that are in accordance with Section 903.3.1.1, 903.3.1.2 or 903.1.3.

19.     A secondary or life/safety access road for the area above Elizabeth is feasible. This road is the Mountain Air Drive connection.

20.     Residents above Elizabeth have been told that no additional lots will be platted for houses before the Mountain Air Drive connection was built. Anthony Henry testified, "Phase 2 of the subdivision I live in, Shangri-La, was supposed to have a second road put in before they allowed—the city allowed development of that second phase of the subdivision." (T012) Christian Henry testified, "When I bought the house seven years ago, I was told that there would be no more developments until that was an actual existing road." (T014) David Rabiski testified there had "been five different times where we've met before the platting board and every time the fire department, police department have said that the road system is not adequate to add more houses." (T027) He testified that "we have repeatedly asked for the second exit out of all of these areas to go out to Rabbit Creek Road and we were told it would happen and we were told that no more houses would be built by the platting board." (T027)

<u>S12420</u>

21.     On May 7, 2018, Twigga, LLC and Spruce Ridge Investments Partnership, the former owners of Anchorage parcels 020-043-03-000 and 020-043-02-000 (Property),

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 7 of 77

submitted applications for a preliminary plat to subdivide the Property into 27 lots. They also submitted applications for two variances. One of the variance applications sought approval of a cul-de-sac exceeding 900 feet. The applications were considered by the Platting Board in Case No. S12420.

22. The Property is located on a single access road that serves the area above Luna. The same single access road serves the area above Elizabeth: Luna dead ends to the north, and a locked gate crosses Luna to the south. The Plaintiffs do not have a key to open the gate. Nor do at least some other residents. Prior to and since December 2019, over 100 homes and lots platted for homes have existed above Luna.

23. With the proposed subdivision, the number of houses and lots platted for houses will total at least 144 above Elizabeth and 134 above Luna. Plaintiffs conservatively estimate that 380 people and 288 cars would be associated with the 144 homes. Neither the Platting Board nor anyone else has disputed these numbers. There is at least one additional home above Luna (15540 Wind Song Drive), bringing the total to at least 145 above Elizabeth and 135 above Luna.

24. In the S12420 application materials, a representative of the then-owners stated that they had owned the Property for over 35 years. He also stated, "The property owners were waiting to develop this land until the Mountain Air connector was built, but the road did not get built." (R459)

25. The Traffic Department reviewed the S12420 applications.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 8 of 77

26.     In a memorandum dated November 22, 2019, the Traffic Department objected to the preliminary plat application. It objected because, with the addition of 27 homes, more than 100 homes or lots platted for homes would exist above Luna, but the Mountain Air Drive connection is feasible. It noted that the "Mountain Air Drive connection is feasible as the design was previously progressed to a 65% design and only stopped due to the removal of State funding." (R470)

27.     The Traffic Department also objected because, with the addition of 27 homes, more than 100 homes or lots platted for homes would exist above Luna, but the Fire Department could not reasonably determine that the Mountain Air Drive connection will be built. The Traffic Department noted that the "revised application indicates potential funding for Mountain Air Drive extension being added to most recent AMATS Transportation Improvement Program (TIP). However, the current TIP only shows funding for design (in 2020) and ROW acquisition (in 2022) and construction is not shown until after 2024 which is outside the bounds of the currently adopted TIP." (R471).

28.     The Traffic Department described secondary access as "critical from both a life and traffic safety viewpoints." (R470). And in objecting to the preliminary plat application, it stated the following: "any future development in this area needs to have assurance that secondary access will be constructed either with the development of the project or construction funding has been obtained for the needed roadway improvements

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                                    Page 9 of 77

in this area;" and the Traffic Department "cannot support the addition of homes in this area without construction of a secondary access being guaranteed." (R470-71)

29.     The Traffic Department also objected to the cul-de-sac length variance application. In making this objection, it noted that, although the application sought approval of a 1,250-foot cul-de-sac, the actual length of the cul-de-sac would be approximately 3,600 feet.

30.     The Fire Department reviewed the S12420 applications.

31.     In a memorandum, dated November 21, 2019, the Fire Department did not object to the S12420 applications subject to five conditions. One condition prohibited construction beyond 11 of the 27 lots (Phase I) until a secondary access road to the Property was funded and approved for construction. Another condition required that each Phase I house have an automatic sprinkler system complying with National Fire Protection Association (NFPA) standards. A third condition required that each lot be developed with Firewise construction and landscaping techniques.

32.     In limiting construction to the Phase I houses, the Fire Department determined that it could not find that a secondary access road would be built. This determination is reflected in the following statement: "Construction beyond Phase I is permitted to be restricted by the fire code official as stated in Exception 2 of IFC Section D107.1." (R473)

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 10 of 77

33.     In a memorandum, dated November 25, 2019, the Private Development Section of the Development Services Department stated that it did not oppose the S12420 applications subject to certain recommendations and conditions. One recommendation was the construction of East 156th Avenue to municipal standards as a 20-foot wide strip paved street from Elizabeth to the west property line of the proposed lot 1 in accordance with AMC 21.08.050(F)(1).

34.     During a public presentation on the S12420 applications, a representative of the applicants represented that the Property would be developed in three phases, and only the first phase would occur prior to construction of the Mountain Air Drive connection. (R485)

35.     The Planning Department prepared a Current Planning Staff Analysis (2019 Staff Analysis), dated December 4, 2019, for the S12420 applications.

36.     The 2019 Staff Analysis provided to the public was incomplete. For example, it did not include many public comments.

37.     The 2019 Staff Analysis determined that the cul-de-sac length variance application met the variance requirements in part because approving it would not harm public welfare or other property. This finding of no harm was based on the fact that the cul-de-sac would not be constructed until a secondary access road was approved. The 2019 Staff Analysis states the following: "This variance would not adversely affect public welfare or negatively affect properties in the vicinity. The cul-de-sac seeking the

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 11 of 77

variance will not be constructed until secondary access is funded and approved for construction." (R391) The 2019 Staff Analysis further stated the following: "Staff is recommending approval of the plat with Phase I only being developed until secondary access is approved for construction. Once the secondary access connection is achieved, the remaining phases of development will take place that constructs the cul-de-sac. Therefore, staff finds the standards have all been substantially met and recommends approval of this variance subject to the conditions at the end of this staff report." (R392)

38.     In connection with the 2019 platting and variance applications, the owner's representative for the applications stated that Mr. Spinelli was the petitioner for the platting application. Likewise, in a November 4, 2019, Affidavit of Posting, Mr. Spinelli certified that he had petitioned for the plat. These were false representations.

39.     On December 4, 2019, the Platting Board approved S12420, including the cul-de-sac length variance application, based on the recommendations in the 2019 Staff Analysis. Platting Board members Kevin Cross, Rebecca Lipson, Valerie Ritz, Mark Seward, Clayton Walker, Jr., and Jana Weltzin voted to approve the applications.

40.     The approval incorporated the Fire Department's recommendations, including imposing a phased construction condition: only 11 homes could be developed prior to approval and funding for a secondary access road.

41.     Other than the November 25, 2019, memorandum of the Private Development Section and a nearly verbatim excerpt from the memorandum in the 2019

Staff Analysis, nothing in the Record addresses the following recommendation on which the Private Development Section conditioned (in part) its non-objection to the S12599 applications: the construction of East 156th Avenue to municipal standards as a 20-foot wide strip paved street from Elizabeth to the west property line of the proposed lot 1 in accordance with AMC 21.08.050(F)(1).

42.     After the Platting Board approved the S12420 applications, Spinell and Mission Hills, LLC (Mission) bought the Property. Mission is owned by Spinell. The deed to parcel 020-043-03-000 changed on September 16, 2020. On that date, Spinell owned parcel 020-043-03-000. The deed to parcel 020-043-03-000 changed again on September 18, 2020. On that date, Mission owned parcel 020-043-03-000. The deed to parcel 020-043-02-000 changed on October 28, 2020. On that date, Mission owned parcel 020-043-02-000.

S12599

43.     By letter, dated October 29, 2020, Mr. Spinelli requested that the Current Planning Division of the Anchorage Planning Department begin the process of amending the preliminary plat the Platting Board approved in S12420. That process resulted in Case No. S12599. Prior to October 29, 2020, Mr. Spinelli had months to work on his application with assistance from the Planning Department and many other Anchorage departments, including the Fire, Traffic, and according to Mr. Spinelli, "Building Safety" Departments. The Planning Department did not make its analysis of the application and

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 13 of 77

the records on which it relied available to the public until March 2, 2020, the day before the public hearing on S12599 was initially scheduled.

44.    In S12599, Mr. Spinelli sought the elimination of three conditions on the basis of which the Platting Board approved S12420. The first condition prohibited construction beyond Phase I until a secondary access road is funded and approved for construction. The second condition required that each Phase I dwelling have an automatic sprinkler system complying with NFPA standards until a secondary access road is funded and approved for construction. The third condition required that each lot be developed with Firewise construction and landscaping techniques.

45.    The application includes false and misleading information.

46.    The application misidentifies the owner of the Property. Mr. Spinelli did not own the Property between October 29, 2020, and May 19, 2021. Nor did Spinell own the Property between those dates.

47.    The application misidentifies the number of homes and lots platted for homes in the area above Luna. Mr. Spinelli misstated that there are 67 homes and 30 vacant lots above Luna. Mr. Spinelli's map identifies 71 lots with homes: 70 lots with homes are numbered, and two lots are numbered 26. Mr. Spinelli's map does not count 4 homes and a vacant lot at the north end of Windsong Drive. In addition, a second house exists on lot 9, and a second house exists on lot 57.

48.    The S12599 application was not complete.

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                           Page 14 of 77

49.     The Record includes no documentation from an agent of Mission that Mission authorized the filing of the S12599 application.

50.     The Record for S12599 includes an Authorization Certificate dated November 10, 2020, whereby Mr. Spinelli authorized Mr. Hoffman to represent him in S12599. The Record includes a letter, dated December 14, 2020, that Mr. Hoffman sent the co-chair of the Rabbit Creek Community Council that states that Mr. Spinelli was the petitioner in S12599.

51.     Nothing in the Record indicates that Spinell authorized the S12599 application other than the statement of Brandon Marcott, a representative of Mr. Spinelli, at the April 7, 2021, hearing on S12599 that he was representing Spinell and the statement in the letter, dated December 21, 2020, of Mr. Hoffman identifying an attachment as an authorization to represent Spinell. These statements are false. Also false is the statement in Mr. Hoffman's December 21, 2020, letter that since S12420 was heard Spinell has taken ownership of the Property.

52.     The Record includes no document with the director's determination regarding the completeness of the S12599 application. The Record includes no notice to the applicant that the application was complete. The Record includes no evidence that the application was submitted in the required form. The Record includes no evidence that the application included all mandatory information. The Record includes no evidence that the application included all supporting materials specified in the Title 21 User's Guide. The

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 15 of 77

Record includes no evidence that the application was accompanied by the applicable fee. The Record includes no evidence that the applicant requested a pre-application conference. The Record includes no evidence that a pre-application conference occurred or that the director waived the pre-application conference requirement. The Record includes no evidence that the applicant received written notification of the conclusions of the pre-application conference. The Record includes no evidence that the applicant received a checklist identifying the topics discussed at the pre-application conference. The Record includes no evidence that public notice of the community meeting was properly provided. The Record includes no evidence that a summary of the community meeting was submitted to the director and to the Rabbit Creek Community Council within seven days after the meeting. The Record includes no summary of the community meeting that includes the content and dates of mailing and the number of mailings. The Record includes no summary of the community meeting that includes the correct number of people who participated.

53.     The Title 21 User's Guide does not exist.

54.     On April 7, 2020, Anchorage voters approved a general obligation bond proposition for Areawide Life/Safety Access Roads Improvements. The proposition authorized Anchorage to issue and sell its general obligation bonds in the principal amount of not to exceed $1.1 million. $110,000 of the $1.1 million was for pre-construction design work to construct the Mountain Air Drive connection. According to

the Anchorage Metropolitan Area Transportation Solutions (AMATS) Transportation Improvement Program (TIP), the estimated cost of the Mountain Air Drive connection is $13.5 million. $110,000 is 0.81% of $13.5 million. The Record includes no evidence that the $110,000 has been spent on pre-construction design work for the Mountain Air Drive connection. Referring to the proposition, Mr. Spinelli stated, "With funding secured for a road that already had preliminary design it appears that the Mountain Air Drive project has regained some momentum." (R332)

55. A decade before Mr. Spinelli filed the S12599 application, Anchorage had a $5.2 million grant to construct the Mountain Air Drive connection. The funding was terminated.

56. In connection with funding for or approval of the construction of the Mountain Air Drive connection, the Record includes no documentation showing that anything occurred between December 4, 2019, and May 19, 2021, other than the April 7, 2020, approval of the general bond proposition.

57. Mr. Spinelli's October 29, 2020, letter includes false statements. Mr. Spinelli falsely asserted "that there are only 67 homes on the lots developed in this area East of Luna Street." (R332) There are more than 67 homes on the platted lots in the area above Luna. Mr. Spinelli falsely asserted that Luna "provides secondary access to Golden View Drive via Prominence Pointe Drive." (R332) Both ends of Luna are impassable.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 17 of 77

58.     Mr. Spinelli's October 29, 2020, letter includes statements with no support in the Record. The Record includes no support for Mr. Spinelli's assertions that "because of the additional upfront expense of a water system and the site specific geographic conditions effect on constructability of the system, this plan depends on approval of the entire plat with no limitation on requirement for phasing." (R331) At the April 7, 2021, hearing, Mr. Marcott repeated Mr. Spinelli's assertion. But he too did not even provide estimated costs that show that developing the subdivision with the proposed private water system would not be profitable unless the Platting Board eliminated the phased construction condition. The Record includes no support for Mr. Spinelli's assertion that many of the vacant lots above Luna "are extremely undesirable due to several factors including presence of bedrock, extreme topography, low producing water wells and a North facing orientation. It is highly unlikely that these remaining lots will develop at a normal pace." (R332)

59.     Mr. Spinelli's position when he submitted the application to eliminate the S12420 phased construction, sprinkler system, and Firewise construction and landscaping techniques conditions was that the residents above Luna would be better protected from fire by the proposed private water system than by a secondary access road. In his October 29, 2020, letter to the Current Planning Division, Mr. Spinelli stated, "After several conversations with the Building Safety, Fire, Traffic and Planning Departments we are optimistic that the MOA as well as the Platting Board will find that this addition [of a

private water system] satisfies the concerns that resulted in the original recommendation of these conditions." (R331) In his October 29, 2020, letter, he stated, "We believe that providing the water for firefighting is a satisfactory improvement that negates the need to limit the development to Phase 1, require automatic sprinkler systems within the homes and for those homes to develop using Fire-wise construction." (R331) In his December 14, 2020, and December 21, 2020, letters, Mr. Hoffman stated that the proposed private water system was in exchange for deleting the secondary access and Firewise construction and landscaping techniques conditions. Mr. Marcott stated at the April 7, 2021, hearing that he thought that the preliminary plat conditions were adopted because the proposed development lacked water for firefighting purposes. He stated that the "issue has just been secondary access in general and they have made it very clear that they would prefer to have—their priority is to get water on hillside." (T041)

60.     As Mr. Kevin Cross stated, the Traffic Department "is pretty adamant about the need for a secondary access." (T041) In a memorandum dated January 26, 2021, the Traffic Department objected to the S12599 application. The Traffic Department objected because secondary access is critical from life and traffic safety viewpoints. The Traffic Department objected because the proposed private water system does not address concerns that there would be no egress from the area above Luna if a major Hillside event impacted Sandpiper Drive. The Traffic Department objected because the proposed funding for the Mountain Air Drive connection was only to complete the previous design

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 19 of 77

and because until funding and construction are occurring there is no change to the availability of secondary access in the area above Luna.

61.     The Record contains no evidence that the traffic engineer approved hydrants on the cul-de-sacs in the proposed development.

62.     In a memorandum dated February 19, 2021, the Fire Department's fire marshal stated that the Fire Department will support the S12599 application on the condition that the preliminary plat require the construction of a private water system that will supply domestic household water to the proposed subdivision's 27 lots and supply firefighting water in accordance with NFPA 1142. The fire marshal's sole stated reason for the Fire Department's position was that the Fire Department determined that the Mountain Air Drive connection will provide secondary access with future development. The sole stated reason for this determination was that the Mountain Air Drive connection has been added to the AMATS TIP, not that a private water system would be installed. The fire marshal did not say or even estimate when the Fire Department believes the road will be built. The fire marshal did not even say that the Fire Department believes the road will be built in the near feature or anytime soon. The fire marshal is not the fire chief. Nor does the Record contain any evidence that he was the designated authority or that he was an authorized representative of the designated authority charged with the administration and enforcement of the International Fire Code or AMC 23.45.D107.1.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 20 of 77

63.     The purpose of NFPA 1142 is to assist the authority having jurisdiction to establish the minimum water supply needed for structural firefighting purposes. The purpose of NFPA 1142 is not to establish a minimum water supply standard for fighting non-structural fires, such as wildfires.

64.     The Record contains no evidence that on November 21, 2019, the Fire Department was not aware that the Mountain Air Drive connection had been added to the AMATS TIP.

65.     The Fire Department's Station 10 is at 14861 Mountain Air Drive, Anchorage, Alaska.

66.     The Traffic Department has a greater ability than the Fire Department to determine whether the Mountain Air Drive connection will be built.

67.     In a memorandum, dated February 11, 2021, the Private Development Section stated that it defers to the Traffic Department and the Planning Department on elimination of the phased construction condition.

68.     The Kittelson & Associates memorandum, dated April 6, 2018, that was provided with the S12599 application, does not address the need for a secondary access road for life and safety purposes in or whether at least four public streets can reasonably connect to the area above Luna. The memorandum considers the impact of the proposed development on the intersection of Rabbit Creek Road and Golden View Drive. That

intersection is over half a mile from the intersection of Golden View Drive and E. 162nd Avenue.

69.     The Notice of Public Hearing, mailed on February 8, 2021, states that written comments would be accepted no later than 1:00 pm on the last business day before the meeting date. It states that after that time, only oral testimony at the hearing would be accepted. The notice and Anchorage's website state that at the hearing individuals would have 3 minutes to testify and representatives of groups would have 5 minutes to testify. They do not state that individuals would have time to direct questions to Planning Department staff or to any person testifying. They do not state that individuals could submit written questions in advance. Anchorage's website states that Platting Board members may ask individuals questions after they testify.

70.     The public hearing on the S12599 application was scheduled for March 3, 2021, and postponed to April 7, 2021. Accordingly, the deadline for submitting written comments was 1:00 pm on April 6, 2021. Plaintiffs first learned about the S12599 application after February 8, 2021. The Summary of Action of the Platting Board's December 4, 2019, hearing on S12420 was uploaded to Anchorage's website on February 25, 2021.

71.     The Current Planning Staff Analysis, dated March 3, 2021 (2021 Staff Analysis), of the Planning Department was written before the Platting Board received public comments on S12599. Although dated March 3, 2021, the 2021 Staff Analysis was

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                                    Page 22 of 77

uploaded to Anchorage's website on March 2, 2021, which was the day of the expiration of the initial period for written public comments.

72.     The Record for S12599 includes the material regarding S12420. The 2019 Staff Analysis provided to the public was never supplemented to include all the required material, such as all the public comments.

73.     On April 5, 2021, Plaintiffs submitted written comments on the S12599 application. Plaintiffs comments included noting that approving S12599 would violate AMC 21.07.060(D)(3)(d), AMC 23.45.D107.1, and AMC 21.08.030(F)(6)(a).

74.     On April 7, 2021, Mr. Spinelli's Fire Hazard Severity Form was posted to Anchorage's website. There is no evidence in the record that it was submitted before 1:00 pm on April 6, 2021 and, therefore, that it was not submitted after the deadline for written submissions for the April 7, 2021, hearing.

75.     At the April 7, 2021, hearing, Plaintiffs submitted oral comments. They had a total of six minutes to do so. Other than each Plaintiff's three minutes of time, they were muted.

76.     At the April 7, 2021, hearing, Platting Board members did not ask Plaintiffs if they had questions for the Planning Department staff or any person who testified. And Plaintiffs had no opportunity to ask questions.

77.     At the April 7, 2021, hearing, had the Plaintiffs had the opportunity to ask questions, they would have asked questions of the Planning Department staff,

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                    Page 23 of 77

Mr. Spinelli's representative (Mr. Marcott), and others who testified regarding

Mr. Spinelli's S12599 application. For each answer, Appellants would have asked for the

specific evidence and records that support the answer.

78. At the April 7, 2021, hearing, Mr. Marcott was allotted and took ten

minutes to testify. After his time expired, he answered several questions. The Platting

Board then invited him to provide additional testimony. Mr. Marcott spoke for several

more minutes, after which he spent several more minutes responding to further questions.

Anchorage's website states that the Platting Board strictly limits the time allowed for

petitioners to testify to 10 minutes.

79. At the April 7, 2021, hearing, Mr. Marcott stated—after the Planning

Department staff and the public testified—"We're planning for roughly five—or, excuse

me, six hydrants across this development fed by this private system." (T035). The Record

includes no data or calculations on the number of hydrants. The Record includes no

evidence that the traffic engineer and the Fire Department approved the location of the

hydrants. The Record includes no data or calculations on the placement of the hydrants.

80. On May 19, 2021, in Case No. S12599, Platting Board members Kevin

Cross, Karin McGillivray, Don Porter, Valerie Ritz, Mark Seward, and Clayton Walker,

Jr. adopted findings and conclusions approving an amendment to the preliminary plat that

the Platting Board approved in S12420. The revised preliminary plat eliminates the

phased construction, sprinkler system, and Firewise construction and landscaping

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 24 of 77

conditions. The revised preliminary plat requires the construction of a private water system that will supply domestic household water to the proposed subdivision's 27 lots and supply firefighting water in accordance with NFPA 1142.

81.    With the amended preliminary plat approved in S12599, 27 lots platted for homes will be added to the area above Luna.

82.    With the amended preliminary plat approved in S12599, over 100 homes and lots platted for homes will exist above Luna, and over 100 homes and lots platted for homes will exist above Elizabeth.

83.    With the amended preliminary plat approved in S12599, over 130 homes and lots platted for homes will exist above Luna, and over 140 homes and lots platted for homes will exist above Elizabeth.

84.    Adding the proposed subdivision will increase the number of families dependent on the single access road by about 20%. And even with the proposed private water system, at least roughly 80% of the families above Elizabeth would not be near a fire hydrant.

85.    The amended preliminary plat includes no requirement regarding hydrants other than requiring the construction of a private water system for the proposed subdivision that will supply firefighting water in accordance with NFPA 1142.

86.    The amended preliminary plat includes no requirement that water be available to protect the lives and property of any residents above Elizabeth who do not

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                                    Page 25 of 77

reside in the proposed subdivision. The amended preliminary plat includes no requirement that any agreement with Anchorage or any Anchorage entity, including the Fire Department, regarding the use of the private water system for fighting fires outside the boundaries of the subdivision. As of May 19, 2021, there was no such agreement.

87. The Platting Board did not make specific findings as to why each AMC 21.03.200(C)(9) criterion was met. For example, the Platting Board made no specific finding that, to the maximum extent feasible, removing the automatic sprinkler condition accomplishes the following: promotes the public health, safety, and welfare; mitigates the incompatibilities between residential densities in the proposed development and in the surrounding neighborhood; provides for efficient movement of vehicular traffic; and furthers the goals and policies of the comprehensive plan and conforms to the comprehensive plan as required by AMC 21.01.080. For example, the Platting Board made no specific finding that, to the maximum extent feasible, removing the Firewise construction and landscaping techniques condition accomplishes the following: promotes the public health, safety, and welfare; mitigates the incompatibilities between residential densities in the proposed development and in the surrounding neighborhood; and furthers the goals and policies of the comprehensive plan and conforms to the comprehensive plan as required by AMC 21.01.080. For example, the Platting Board made no specific finding that, to the maximum extent feasible, retaining the cul-de-sac variance while removing the phased construction requirement accomplishes the following: promotes the public

health, safety, and welfare; mitigates the incompatibilities (e.g., regarding traffic) between residential densities in the proposed development and in the surrounding neighborhood; provides for efficient movement of vehicular traffic; provides access for firefighting apparatus; and furthers the goals and policies of the comprehensive plan, which include providing emergency access and egress, and conforms to the comprehensive plan as required by AMC 21.01.080.

88.     The Record does not support each finding of fact that the Platting Board identified in its approval of S12599. For example, the Record does not support the finding that the Mountain Air Drive connection will be built.

89.     The Platting Board's approval of the S12599 application cannot be understood based on the findings. For example, the findings do not explain how the variance for the cul-de-sac length approved in S12420 remains valid despite the elimination of the phased construction condition in S12599.

90.     The Platting Board approved the application to eliminate S12420 conditions based on the determination that the residents above Luna would be better protected from fire by the proposed private water system than by a secondary access road.

91.     Other than statements in the Record that the proposed private water system would include fire hydrants that the Fire Department could access, the only statements in the Record on how the Fire Department could use the proposed private water supply are

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 27 of 77

those of Mr. Marcott and some members of the Platting Board at the April 7, 2021, hearing. Those statements were made after the Planning Department staff and public testified. Those statements include Mr. Marcott's statement that a fire hydrant is planned to be between lots 5 and 6. (T035) They include Mr. Marcott's statement that there are going to be six hydrants across the development. (T035) They include Mr. Marcott's statement that "[w]e're anticipating probably somewhere in the 50 to 60,000 gallon range." (T038) They include Mr. Marcott's statement that "we're not planning to have any restrictions for where it can't be used if the AFD needs it." (T039) They include Mr. Marcott's statement, after he stated that he could not say how long refilling a fire truck takes, that if he "had to take a guess" he "would think that they're probably carrying three to 5,000 gallons maybe, somewhere in three to 4,000 gallons. We going to be providing water flow at 500 GPM minimum so maybe six, seven, eight minutes to fill a truck . . . with a NASCAR pit crew, I guess." (T044) They include Mr. Cross's statement that, "[a]ccording to Google," refilling a fire truck takes "two minutes and 24 seconds." (T044) They include Mr. Walker's statement that the proposed private water system would save about eight minutes of driving. (T045)

92.     The Record contains no evidence that a private water system for 27 additional homes could make an evacuation in the area above Elizabeth in the event of a wildfire unnecessary, removing the need for a secondary access road.

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                          Page 28 of 77

93.     Adding 27 homes to the area above Elizabeth increases the number of lives at risk in the event of an evacuation. Adding 27 homes puts the occupants of the 27 homes at risk when the single access road is blocked during an emergency, for example, in the event a wildfire from the south or west that blocks egress from and ingress into the area above Elizabeth.

94.     The Record contains no evidence that, in the event of a wildfire above Elizabeth, the Fire Department will be able to access the private water system given that the area has only one access road. The Record contains no evidence that, in the event of a wildfire above Elizabeth, the Fire Department would access the private water system given that the area has only one access road. No amount of water will save lives and homes above Elizabeth if firetrucks cannot access the area and residents cannot evacuate because of an accident or burning trees blocking traffic on the single access road connecting to Golden View Road or because of the inability to enter the line of traffic on Golden View. With a fast moving wildfire and hundreds of people fleeing, accidents, burning trees, and traffic jams are likely to prevent residents from escaping and fire trucks and vehicles of other first responders from reaching the wildfire. The Fire Department shares residents' "concern about adequate egress routes for subdivisions, both new and existing." (R122)

95.     The Record contains no evidence that, in the event of a wildfire, Fire Department access to the private water system would be adequate to stop a wildfire from destroying homes above Elizabeth.

96.     The existence of a private water supply will save no lives, including of any person in the 27 homes in the proposed subdivision, in the event of a non-fire emergency that requires an evacuation of residents above Elizabeth or access to the area above Elizabeth by medical personnel, police, and/or other first responders.

97.     The Platting Board ignored that the International Wildland-Urban Interface Code (IWUIC) and NFPA 1141 require that residential areas with more than 100 homes have at least two access roads. The Platting Board ignored that NFPA 1141 identifies requirements for protecting buildings from fire in wildland, rural, and suburban areas where development is intended. The Platting Board ignored that NFPA 1144 states that "[l]ife safety is paramount in all fire situations, and residents and occupants are encouraged to plan for timely evacuation or shelter." (R116)

98.     The Platting Board's position in approving the S12599 application to eliminate the S12420 phased construction, sprinkler system, and Firewise construction and landscaping conditions is that a secondary access road is unnecessary as a matter of law if the proposed private water system exists. Mr. Cross stated, the question is whether "approving this plat, removing that requirement for secondary access but getting a fire hydrant and fire protection . . . or expanding the fire protection to the hillside, does that

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 30 of 77

benefit outweigh the inconvenience of increased traffic on the road before we put a secondary access." (T042) Mr. Cross stated, "[w]e're just making small amendments. Then do we approve a fire plan in lieu of allowing—and we're getting that but we're just maybe not getting that secondary access as quickly as we anticipated." (T042) Mr. Cross stated, "when we originally had this conversation, we all understood how important it was that the secondary access was in there." (T049) He stated, "although we don't get that secondary access, what we are allowing them to do by removing this phasing plan is, essentially, add seven [sic] fire hydrants and add a way for fire trucks to refuel which is the reason for the access." (T049) He stated, "you need two points of egress for a bedroom but if you only have one, wouldn't you want a fire sprinkler system and an extinguisher in your room and I think that's what we're doing." (T049) He stated, until the Mountain Air Drive connection is "done, I think adding the fire hydrants and allowing this to go through is a fantastic way to resolve some of the fire concerns in this area until that road is in." (T050) Mr. Porter stated, the "discussion that we've had has been about access versus water and the fire department has clearly determined that water is more important than access and they've stated it'll be 50 or 60,000 gallons worth of storage." (T050) He stated, "adding the fire storage and water to fight a fire has . . . been deemed a higher priority based on the calculations that have been put in front of us. And so that's why I would be supporting this motion." (T051) None of the Platting Board members corrected any of these statements.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 31 of 77

99.     The Platting Board's findings in approving S12599 state that, given the expense of the proposed private water system, the system cannot be developed unless the Platting Board eliminates the phased construction condition. The Record includes no cost data that supports this finding.

100.     The Record includes no evidence that Mr. Spinelli, Spinell, or Mission cannot profitably develop the property without the elimination of the phased construction condition.

101.     The Record includes no evidence that any harm to Mr. Spinelli, Spinell, or Mission from not eliminating the phased construction condition outweighs the harm to residents above Elizabeth from adding 27 homes to the area above Elizabeth in the absence of a secondary access road.

102.     The Platting Board's findings state that the Fire Department supports eliminating the phased construction condition because of the proposed private water system. The Record includes no evidence of this or that the Fire Department believes that for saving lives in the area above Elizabeth the proposed private water system is more valuable than a secondary access road. The Record shows that the fire marshal's sole reason for supporting the elimination of the phased construction condition was the determination that the Mountain Air Drive connection will be built.

103.     The Platting Board's findings state that the Traffic Department opposes eliminating the phased construction condition because of the amount of Traffic on

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 32 of 77

Sandpiper Drive. The Record includes significant evidence that the Traffic Department also opposed eliminating the condition for life safety reasons.

104. The Platting Board's findings state that the Platting Board can eliminate the phased construction condition because the Mountain Air Drive connection will be built. There is no evidence in the Record that supports this finding other than the Fire Department's finding, which is based solely on the road's inclusion in the AMATS TIP, and the $110,000 for pre-construction design work. In an email, dated January 15, 2021, commenting on the S12599 application, the Right of Way Section in the Anchorage Development Services Department stated that it sees no dedication of right of way on the northwest corner of the proposed subdivision. It stated that there are "no guarantees when the peripheral roads are to be built or at all." (R369) The 2021 Staff Analysis notes but otherwise ignores the Right of Way Section's comments. Mr. Cross recognized them. At the April 7, 2021, hearing, he stated, "They haven't even acquired the land." (T041) And he stated, "they're still accumulating funding to even connect onto Mountain Air." (T041) Mr. Cross also stated, "We have promises and hopes of a secondary access but we originally approved this with only 11 hou[se]s, understanding that secondary access is critical." (T040) As Mr. Cross noted, the Mountain Air Drive connection "still is basically proposed." (T041) Mr. Cross also stated that the Mountain Air Drive connection "is not guaranteed to happen in the immediate future." (T050) There is no evidence in the Record regarding when the Mountain Air Drive connection will be built.

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                                    Page 33 of 77

105.    The Platting Board's findings state that the likelihood that the Mountain Air Drive connection will be built is "very high." The Record includes no evidence that supports this finding.

106.    At the April 7, 2021, hearing, Mr. Marcott conceded—after the Planning Department staff and public testified—that no one knows when or even if the secondary access road will be built. He stated, "Mountain Air Drive is in design which is the best that we can do." (T041)

107.    The Platting Board's findings do not state that providing the area above Luna vehicular access to more than one public street is not reasonably feasible due to topography, natural features, or the configuration of existing or adjacent developments. The Record includes no evidence that providing the area above Luna vehicular access to more than one public street is not reasonably feasible due to topography, natural features, or the configuration of existing or adjacent developments.

108.    The Platting Board ignored the effect of eliminating the phased construction condition on its S12420 approval of the cul-de-sac length variance. The Record includes no evidence that without the phased construction condition the cul-de-sac length variance will not be detrimental to the public welfare or injurious to property.

109.    The Platting Board's findings state that no one has complained to the Fire Department regarding ingress or egress to the area above Luna. The Record includes no evidence that supports this finding.

110.    The Platting Board's findings state that the gate on Luna may be removed. The Record includes no evidence that the Fire Department supports removing the gate. Nor does the Record include any other evidence that the gate will be removed.

111.    The Platting Board's findings state that property owners' insurance rates will decrease because of the existence of fire hydrants. The Record includes no evidence that supports this finding.

112.    The Platting Board's findings reflect Mr. Marcott's statement—after the Planning Department staff and public testified—that "We're anticipating probably somewhere in the 50 to 60,000 gallon range" for the private water system's reservoir size. (T038)  The Record includes no data or calculations that support this.

113.    The Platting Board's findings reflect Mr. Marcott's statement—after the Planning Department staff and public testified—that "We're going to be providing water flow at 500 GPM minimum." (T044) The Record includes no data or calculations that supports this. NFPA 1142 mandates a water delivery rate of 1,000 gallons per minute if the total water supply required equals or exceeds 20,000 gallons.

114.    The Platting Board's findings state that the IWUIC Fire Hazard Severity Form (Form) more strongly weighs access to water than a secondary access road. The Form is not part of the IWUIC and can become part of it only if specifically included in the adopting ordinance. Neither the AMC nor the Anchorage Municipal Code of Regulations (AMCR) include the Form. The Form does not support the position that a

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 35 of 77

private water system would eliminate the need for a secondary access road where a proposed subdivision will neighbor multiple subdivisions. The Form provides a scoring system for assessing the fire hazard severity of a building site based on features that impact the hazard level of the building site. The ingress and egress scoring points are subdivision design points, and the total points are a total for a subdivision. The Form is not evidence of the position that a private water system is more important than a secondary access road for saving lives in areas such as those above Elizabeth. Here, the private water system will serve one subdivision in an area with multiple subdivisions that lack a water supply and where all of the subdivisions are dependent on only one hazardous road that cuts through an area that is, as determined by the U.S. Forest Service and the Municipality, at risk of wildfire and that already serves over a hundred homes and lots platted for homes.

115. Mr. Spinelli or his representative did not accurately complete the Form. For example, he indicated that the subdivision will have dead-end roads 200 feet or less in length despite obtaining a variance for a 1,250-foot long cul-de-sac. Also, he indicated that the gradient of the topography is more than 8% but less than 20%, but his representative stated that in some areas of the subdivision the gradient exceeds 20%.

116. No evidence in the Record shows that, with the proposed private water system, removing the requirement under S12420 to construct Phase I homes with automatic sprinkler systems accomplishes the following to the maximum extent feasible:

promotes the public health, safety, and welfare; mitigates the incompatibilities between residential densities in the proposed development and in the surrounding neighborhood; and furthers the goals and policies of the comprehensive plan and conforms to the comprehensive plan as required by AMC 21.01.080.

117. NFPA 1142 states that, according to the NFPA's records, in 96% of fires in buildings with automatic sprinkler systems, the sprinkler system controls or extinguishes the fire.

118. The fire marshal and the Building Official and Director of the Development Services Department jointly stated, "The data on sprinkler efficiency is compelling. An NFPA study found that they reduce the risk of death by 85%." (R121) They stated, "sprinklers reduce fire damage by 97% and limit the damage to one room on average . . . . Overall, 90 percent of the time the activation of a single sprinkler . . . is sufficient to control the fire." (R121) They stated that because "home fires become deadly within 2-3 minutes due to modern building materials and furnishings and more open designs while discovery of the fire, calling 911 and arrival of fire response crews will occur rarely in this timeframe, the difference in being sprinklered is literally one of life and death." (R121) They stated, "Sprinkler provisions such as the one discussed above reduce house fire emissions by 99% by extinguishing the fire in its infancy." (R122) They stated, "By greatly reducing the potential for a house fire to spread to wildland fuels and become a wildland fire threatening hundreds or even thousands of structures as higher summer

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 37 of 77

temperatures with less rain exacerbate the risk, sprinklers achieve an exponential reduction in fire emissions." (R122) They stated, "[w]ith flashover conditions occurring in under 5 minutes, by the time suppression resources arrive much of the home can already be involved. On a dry or windy day this could easily transition to multiple structure involvement or a wildland fire." (R121)

119.    No evidence in the Record shows that, with the proposed private water system, removing the requirement under S12420 to develop all lots with Firewise construction and landscaping techniques accomplishes the following to the maximum extent feasible: promotes the public health, safety, and welfare; mitigates the incompatibilities between residential densities in the proposed development and in the surrounding neighborhood; and furthers the goals and policies of the comprehensive plan and conforms to the comprehensive plan as required by AMC 21.01.080.

120.    No evidence in the Record shows that the municipal traffic engineer approved waivers of AMCR 21.90.003(F)(3)(a)-(c).

121.    No evidence in the Record shows that the municipal engineer approved design or construction waivers of AMCR 21.90.003(F)(3)(a)-(c).

<u>Plaintiffs' Appeal of S12599</u>

122.    On June 8, 2021, Plaintiffs appealed the Platting Board's decision in S12599 to the Board of Adjustment. Plaintiffs' Causes and Reasons for Reversing S12599 included noting that the approval of S12599 violated AMC 21.01.030(B), (G),

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 38 of 77

(K), and (L); AMC 21.03.020(B)(2)(a); AMC 21.03.020(D)(1); AMC 21.03.020(E)(2); AMC 21.03.020(E)(3); AMC 21.03.020(F)(1); AMC 21.03.020(F)(2); AMC 21.03.020(F)(3); AMC 21.03.200(C)(2); AMC 21.03.200(C)(9); AMC 21.03.240(G)(3)(b); AMC 21.07.060(D)(3)(d); AMC 21.08.030(F)(6)(a); AMC 23.45.D107.1; AMCR 21.11.302(C); AMCR 21.11.304; AMCR 21.11.306(C); AMCR 21.20.003; AMCR 21.90.003(C)(5); AMCR 21.90.003(D)(3); AMCR 21.90.003(F)(3)(a); AMCR 21.90.003(F)(3)(b); AMCR 21.90.003(F)(3)(c); and Plaintiffs' due process and equal protection rights under the U.S. and State of Alaska Constitutions.

123.    To appeal the approval of S12599, Plaintiffs were required to pay and paid a $1,080 appeal fee, $240 to compile the record, and $10 to receive the records electronically. Plaintiffs were also required to pay and paid for the transcript of the portion of the April 7, 2021, Platting Board hearing on S12599. The transcript cost $297. Plaintiffs were required to pick up the electronic record in person rather than receive it by email. Had Plaintiffs requested a hard copy of the Record, they would have been charged $0.30 per page. The Notice of Appeal to the Board of Adjustment form states that appellants are charged $1.70 per page for the preparation of the record.

124.    On June 8, 2021, Plaintiffs objected to the fees required to appeal a Platting Board decision to the Board of Adjustment. Plaintiffs objected on the grounds that the fees were arbitrary and excessive and that they discouraged appeals. Plaintiffs requested a fee waiver under AMC 21.03.050(A)(9).

125.    On September 3, 2021, and November 18, 2021, the Board of Adjustment denied Plaintiffs' fee waiver request.

126.    Plaintiffs repeatedly asked the Municipal Clerks' Office to explain the bases for the fees. On October 2, 2021, Plaintiffs sent the Municipal Clerks' Office an email requesting a breakdown of the work involved in compiling the Record, including who did what, how long each step took, and what was the hourly rate of each person who did the work (based on their salary and benefit costs), or the records that show what work was done, who did it, and how long it took. The Municipal Clerks' Office and the Board of Adjustment did not provide the breakdown or the records.

127.    On November 4, 2021, Mr. Spinelli filed Brief of Appellee.

128.    Neither the Platting Board nor the Planning Department filed any response to Plaintiffs' appeal of S12599. Only Mr. Spinelli filed a response.

129.    On November 26, 2021, Plaintiffs filed Appellants' Reply Brief.

130.    On December 14, 2021, Board of Adjustment members Bernd Guetschow, Robert Stewart, and Tamas Deak affirmed the Platting Board's approval of the S12599 application. The Board of Adjustment found that the Record supports the Platting Board's findings. The Board of Adjustment found that the Platting Board's approval is reasonable based on the Platting Board's findings. The Record does not support the Board of Adjustment's findings. The Board of Adjustment's findings are erroneous.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 40 of 77

131.   The Board of Adjustment decided that it lacked jurisdiction to decide whether Mr. Spinelli had authority to file the S12599 application, whether the Platting Board members had conflicts of interest, whether the Platting Board violated Plaintiffs' due process rights, and whether the Platting Board violated Plaintiffs' equal protection rights. The Board of Adjustment cited no authority for these decisions.

132.   The Board of Adjustment decided that Plaintiffs waived their rights to make certain claims that the Platting Board violated federal and municipal laws, including their due process and equal protection claims, their claim that S12599 violated AMC 21.07.060(D)(3)(d), their claim that S12599 violated AMC 21.08.030(F)(6)(a) and AMC 21.03.240(G)(3)(b), their claim regarding Mr. Spinelli's lack of authority to submit the S12599 application, and their claim regarding their right to ask questions at the April 7, 2021, hearing. The Board of Adjustment cited no authority for these decisions.

133.   Plaintiffs never received notice that the Board of Adjustment would not consider issues with S12599 that were not raised with the Platting Board.

134.   The Board of Adjustment recognized "that the public may have some legitimate concerns about the process as it occurred in this case and the outcome, although not sufficiently addressed by or perhaps protected in the current Code, or justiciable by us for the reasons stated herein." (Findings and Decision of the Board of Adjustment Affirming Platting Board Decision, dated December 14, 2021, page 17) The

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 41 of 77

Board of Adjustment "recommend[ed] policy-makers seriously consider the concerns and how best to address those concerns, perhaps through future Code changes." *Id*.

135.    The Board of Adjustment refused to consider any of the exhibits attached to Plaintiffs' Causes and Reasons or to Plaintiffs' Reply Brief as part of the record on appeal or to take judicial notice of any exhibit or any facts in any exhibit. In refusing to do so, the Board of Adjustment did not review any specific exhibit.

136.    Plaintiffs' first exhibit attached to their Causes and Reasons, dated June 8, 2021, is two Public Inquiry Parcel Details. Plaintiffs requested that the Board of Adjustment take judicial notice of these documents. These documents came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

137.    Plaintiffs' third through fifth exhibits attached to their Causes and Reasons, dated June 8, 2021, and Plaintiffs' Exhibit B attached to their Reply Brief, dated November 26, 2021, submitted to the Board of Adjustment are screenshots of NFPA 1142, NFPA 1141, and NFPA 1144. The Platting Board directly or indirectly considered the NFPA. Plaintiffs requested that the Board of Adjustment take judicial notice of these screenshots. These screenshots came from the NFPA's website. The accuracy of NFPA's website cannot reasonably be questioned.

138.    Plaintiffs' sixth and thirtieth exhibits attached to their Causes and Reasons, dated June 8, 2021, are webpages from Spinell's website. Plaintiffs requested that the

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 42 of 77

Board of Adjustment take judicial notice of these webpages. The accuracy of Spinell's website cannot reasonably be questioned.

139. Plaintiffs' seventh exhibit attached to their Causes and Reasons, dated June 8, 2021, is a letter, dated September 22, 2020, from Robert Doehl, Building Official and Director, Development Services Department, and the fire marshal to the Huffman-O'Malley Community Council Members. Plaintiffs requested that the Board of Adjustment take judicial notice of this letter. This letter came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

140. Plaintiffs' eighth exhibit attached to their Causes and Reasons, dated June 8, 2021, is pages from a report on Anchorage demographics by the Anchorage Economic Development Corporation. Plaintiffs requested that the Board of Adjustment take judicial notice of these pages. These pages came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

141. Plaintiffs' ninth exhibit attached to their Causes and Reasons, dated June 8, 2021, is pages from an Anchorage report titled All Hazards Mitigation Plan Update, dated December 2016. Plaintiffs requested that the Board of Adjustment take judicial notice of these pages. These pages came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

142. Plaintiffs' tenth exhibit attached to their Causes and Reasons, dated June 8, 2021, is pages from Anchorage's Hillside District Plan Alternatives, dated April 2008.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 43 of 77

Plaintiffs requested that the Board of Adjustment take judicial notice of these pages. These pages came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

143.    Plaintiffs' eleventh exhibit attached to their Causes and Reasons, dated June 8, 2021, is a webpage titled Wildfire Mitigation. Plaintiffs requested that the Board of Adjustment take judicial notice of this webpage. This webpage came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

144.    Plaintiffs' twelfth exhibit attached to their Causes and Reasons, dated June 8, 2021, is pages from Anchorage's Hillside Subarea Transportation Study, dated October 2006. Plaintiffs requested that the Board of Adjustment take judicial notice of these pages. These pages came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

145.    Plaintiffs' thirteenth exhibit attached to their Causes and Reasons, dated June 8, 2021, is pages from Anchorage's Hillside District Plan, dated April 13, 2010. The Platting Board directly or indirectly considered the Hillside District Plan. Plaintiffs requested that the Board of Adjustment take judicial notice of these pages. These pages came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 44 of 77

146.     Plaintiffs' fourteenth, fifteenth, and twentieth exhibits attached to their Causes and Reasons, dated June 8, 2021, are screenshots from the 2021 IWUIC. The Platting Board directly or indirectly considered the IWUIC. Plaintiffs requested that the Board of Adjustment take judicial notice of these screenshots. These screenshots came from IWUIC's website. The accuracy of IWUIC's website cannot reasonably be questioned.

147.     Plaintiffs' sixteenth exhibit attached to their Causes and Reasons, dated June 8, 2021, is Anchorage Ordinance No. 2020-2, As Amended, an Assembly Memorandum from the Anchorage mayor, and related documents. Plaintiffs requested that the Board of Adjustment take judicial notice of these documents. These documents came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

148.     Plaintiffs' seventeenth and eighteenth exhibits attached to their Causes and Reasons, dated June 8, 2021, and Plaintiffs' Exhibit A attached to their Reply Brief, dated November 26, 2021, submitted to the Board of Adjustment are tables from the AMATS FFY 2019-2022 TIP. Plaintiffs requested that the Board of Adjustment take judicial notice of these tables. These tables came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

149.     Plaintiffs' nineteenth exhibit attached to their Causes and Reasons, dated June 8, 2021, is pages from Chapter 4. Travel in Anchorage Today of the Anchorage

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 45 of 77

Bowl 2025 Long-Range Transportation Plan. Plaintiffs requested that the Board of Adjustment take judicial notice of these pages. These pages came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

150.    Plaintiffs' twenty-first exhibit attached to their Causes and Reasons, dated June 8, 2021, is Ms. McGillivray's LinkedIn page, a webpage from her employer's website, a webpage from AlaskaRealEstate.com, a Bloomberg webpage regarding Black-Smith Bethard & Carlson LLC, and the cover page of a Summary Appraisal Report by Ryan McGillivray, Appraiser, Ms. McGillivray's husband. Plaintiffs requested that the Board of Adjustment take judicial notice of the LinkedIn webpage. This page came from Ms. McGillivray's account. The accuracy of her LinkedIn webpage cannot reasonably be questioned.

151.    Plaintiffs' twenty-second exhibit attached to their Causes and Reasons, dated June 8, 2021, is the minutes of the Platting Board's October 7, 2020, meeting. Plaintiffs requested that the Board of Adjustment take judicial notice of the minutes. The minutes came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

152.    Plaintiffs' twenty-third exhibit attached to their Causes and Reasons, dated June 8, 2021, is an Anchorage webpage containing information on participating in the Platting Board's April 7, 2021, hearing. Plaintiffs requested that the Board of Adjustment

take judicial notice of the webpage. The webpage came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

153.   Plaintiffs' twenty-fourth exhibit attached to their Causes and Reasons, dated June 8, 2021, is the minutes of the Platting Board's April 7, 2021, hearing. Plaintiffs requested that the Board of Adjustment take judicial notice of the minutes. The minutes came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

154.   Plaintiffs' twenty-fifth exhibit attached to their Causes and Reasons, dated June 8, 2021, is a screenshot of realestatebrokersofalaska.com, a webpage from AlaskaRealEstate.com, webpages from alaskarex.com, and a webpage on Sveta Cross, Mr. Cross's wife, from Guaranteed Rate. Mr. Cross is the president of The Real Estate Exchange (REX). alaskarex.com is REX's website. Plaintiffs requested that the Board of Adjustment take judicial notice of these webpages. The accuracy of alaskarex.com cannot reasonably be questioned.

155.   Plaintiffs' twenty-sixth exhibit attached to their Causes and Reasons, dated June 8, 2021, is a Facebook page of Valerie Ritz Real Estate and includes 2021 and 2020 Biennial Reports filed on the website of the Division of Corporations, Business, and Professional Licensing of the State of Alaska Department of Commerce, Community, and Economic Development (DCCED) by numerous companies owned and operated by Paul Ritz, Ms. Ritz's husband and/or Ms. Ritz. Plaintiffs requested that the Board of

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 47 of 77

Adjustment take judicial notice of this page and these reports. The reports came from DCCED's website. The accuracy of the Valerie Ritz Real Estate Facebook page and DCCED's website cannot reasonably be questioned.

156.    Plaintiffs' twenty-seventh exhibit attached to their Causes and Reasons, dated June 8, 2021, is webpages from the Alaska Law Offices, Inc. website. Mr. Walker is the president and sole owner of Alaska Law Offices, Inc. Plaintiffs requested that the Board of Adjustment take judicial notice of the webpages. The accuracy of the Alaska Law Offices, Inc. website cannot reasonably be questioned.

157.    Plaintiffs' twenty-eighth exhibit attached to their Causes and Reasons, dated June 8, 2021, is a DDCED webpage with licensing details for Mr. Seward and a Better Business Bureau webpage for Mr. Seward's company, Seward & Associates Land Surveying. Plaintiffs requested that the Board of Adjustment take judicial notice of these webpages. The accuracy of DDCED's website cannot reasonably be questioned.

158.    Plaintiffs' twenty-ninth exhibit attached to their Causes and Reasons, dated June 8, 2021, is Mr. Porter's LinkedIn page and a webpage from R&M Consultants, Inc., Mr. Porter's employer. Plaintiffs requested that the Board of Adjustment take judicial notice of the webpages. The LinkedIn page came from Mr. Porter's account. The accuracy of his LinkedIn webpage cannot reasonably be questioned.

159.    Plaintiffs' thirty-first exhibit attached to their Causes and Reasons, dated June 8, 2021, is the 2021, 2019, 2017, and 2015 Biennial Reports filed on DCCED's

website by Spinell. Plaintiffs requested that the Board of Adjustment take judicial notice of this page and these reports. The reports came from DCCED's website. The accuracy of DCCED's website cannot reasonably be questioned.

160. Plaintiffs' thirty-second exhibit attached to their Causes and Reasons, dated June 8, 2021, is Plaintiffs' copy of the Platting Board's March 3, 2021, Notice of Public Hearing. The Platting Board directly or indirectly considered this document. Plaintiffs requested that the Board of Adjustment take judicial notice of this document. The document exists in the Planning Department's files, and therefore its accuracy cannot reasonably be questioned.

161. Plaintiffs' thirty-third exhibit attached to their Causes and Reasons, dated June 8, 2021, is a webpage titled Public Participation. The Platting Board directly or indirectly considered this webpage. Plaintiffs requested that the Board of Adjustment take judicial notice of this webpage. This webpage came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

162. Plaintiffs' thirty-fourth exhibit attached to their Causes and Reasons, dated June 8, 2021, is webpages with Public Inquiry Search Results for Spinell and Mission. Plaintiffs requested that the Board of Adjustment take judicial notice of these webpages. These webpages came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

163. Plaintiffs' thirty-fifth exhibit attached to their Causes and Reasons, dated June 8, 2021, is maps of the area above Elizabeth. Plaintiffs requested that the Board of Adjustment take judicial notice of these maps. These maps came from Anchorage's website. The accuracy of Anchorage's website cannot reasonably be questioned.

164. Plaintiffs' Exhibit C attached to their Reply Brief, dated November 26, 2021, submitted to the Board of Adjustment is an Option to Purchase Real Estate, dated August 27, 2015. The Platting Board directly or indirectly considered this document. This document is included among the materials linked to on Anchorage's webpage for the S12420 application. Plaintiffs implicitly requested that the Board of Adjustment take judicial notice of this document. The accuracy of Anchorage's website cannot reasonably be questioned.

165. Plaintiffs' Exhibit D attached to their Reply Brief, dated November 26, 2021, submitted to the Board of Adjustment is the Summary of Action of the Platting Board's December 4, 2019, hearing. The Platting Board directly or indirectly considered this document. This document is included among the materials linked to on Anchorage's webpage for the S12420 application. Plaintiffs implicitly requested that the Board of Adjustment take judicial notice of the Summary of Action. The accuracy of Anchorage's website cannot reasonably be questioned.

166. Even excluding Plaintiffs' exhibits from the Record, the Board of Adjustment's findings are not supported by the remaining materials in the Record. Even

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 50 of 77

excluding Plaintiffs' exhibits from the Record, the Board of Adjustment's findings are erroneous.

## Platting Board and Board of Adjustment Bias in Favor of Mr. Spinelli

167.   Spinell describes itself as Alaska's largest homebuilder, and its website states that it has built over 3,200 homes in Southcentral Alaska. Spinell and those financially associated with it, including Mission Hills, own an extensive amount of property in Anchorage.

168.   Mr. Spinelli is a commissioner on the Anchorage Planning and Zoning Commission.

169.   The Platting Board members who approved S12599 consisted of Mr. Cross, a real estate broker whose wife is a vice president of a mortgage lending company; Ms. McGillivray, a friend of Mr. Spinelli's family whose husband is a property appraiser; Mr. Porter, a designer of underground water systems; Ms. Ritz, a real estate agent whose husband owns many real estate businesses; Mr. Seward, a land surveyor; and Mr. Walker, an attorney who practices real estate law. Developers' interests and Platting Board members' financial, professional, and personal interests are aligned. The Platting Board members' livelihoods and professional and personal interests created a substantial probability that they were biased in favor of Mr. Spinelli. Their livelihoods and interests created the appearance of impropriety in the proceeding. Their livelihoods and interests diminished the public trust.

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                    Page 51 of 77

170.    Mr. Cross is a licensee with Real Estate Brokers of Alaska. He is the

president of the Real Estate Exchange Network, which describes itself as Alaska's largest

and oldest real estate investment network. Mr. Cross stated that adding 27 families

imposes only "the inconvenience of increased traffic," and the Platting Board is "just

making small amendments." (T042) Mr. Cross's spouse, Sveta Cross, is on the leadership

team of the Real Estate Exchange Network and is a VP of Mortgage Lending at

Guaranteed Rate, a residential mortgage company.

171.    Ms. McGillivray stated that she has a personal relationship with

Mr. Spinelli's family. She requested to recuse herself in deciding S12599. She stated that

she was advised to do so. The Platting Board directed Ms. McGillivray to participate in

S12599. She was not asked about the nature of the personal relationship, who advised her

to recuse herself from matters involving Spinell and why, or why she could now be

impartial. Ms. McGillivray has requested to recuse herself in all other cases involving

Spinell. She was recused in at least one Platting Board case, Case No. S12575, where

Spinell was the applicant. Platting Board members Mr. Cross, Mr. Porter, Ms. Ritz,

Mr. Seward, and Mr. Walker voted to direct Ms. McGillivray to participate in S12599

and voted against her participation in S12575. Platting Board members Ms. Lipson and

Ms. Weltzin also voted against her participation in S12575. In S12575, no written

comments were submitted.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 52 of 77

172.    Ms. McGillivray is responsible for public outreach and business development for Michael Baker International, a provider of engineering and consulting services for developments. Mr. McGillivray is a property appraiser with Black-Smith, Bethard & Carlson LLC, a company whose business includes renting, buying, selling and appraising real estate.

173.    Mr. Porter is the Utilities Group Manager at R&M Consultants, Inc. He designs underground water systems.

174.    Ms. Ritz is a real estate agent. She and her husband own many real estate businesses in Alaska.

175.    Mr. Seward is a land surveyor who owns Seward & Associates Land Surveying.

176.    Mr. Walker practices real estate law with Alaska Law Offices, Inc. He has practiced real estate law for over 20 years.

177.    The Platting Board members did not indicate that they and their immediate family members have not done business with Mr. Spinelli or any entity that he is financially associated with, including Spinell or Mission.

178.    The Platting Board members did not represent that they and their immediate family members would not do business with Mr. Spinelli or any entity that he is financially associated with.

*Dukoff v. Anchorage*
Case No. 3:22-cv-00007-SLG                                              Page 53 of 77

179.    The Platting Board members did not represent that disapproving S12599 would not adversely affect them financially or professionally or adversely affect the companies they and their spouses work for.

180.    The Platting Board unanimously approved S12599. Approving S12599 was in the business interests of all of the Platting Board members and/or their spouses. There is a substantial probability that their judgment was affected by the fact that disapproving it would have adversely affected their and/or their spouses' chances of doing business with Mr. Spinelli. There is a substantial probability that their judgment was affected by the fact that disapproving it would have adversely affected their and/or their spouses' chances of doing business with entities he is financially associated with. There is a substantial probability that their judgment was affected by the fact that disapproving it would have adversely affected their and/or their spouses' chances of doing business with others involved in the real estate industry. There is a substantial probability that their judgment was affected by the fact that their own and/or their spouses' jobs and income—like Mr. Spinelli's—are or were closely related to real estate development.

181.    The Platting Board's findings include findings that are irrelevant to whether S12599 should have been approved and/or that are unsupported. For example, the Platting Board stated that it considered the off-site impacts of drainage, water availability, and water quality. For example, the Platting Board found that the private water system will contain 50,000 to 60,000 gallons of water, but Mr. Marcott stated that they are

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 54 of 77

"anticipating probably somewhere in the 50 to 60,000 gallon range." (T038) For example, the Platting Board found that the Fire Department has received no complaints regarding the existence of a single access road. For example, the Platting Board found that the locked gate across Luna is likely to be removed. For example, the Platting Board found that insurance rates for property owners nearby the proposed development will be reduced. For example, the Platting Board found that it is "entitled to rely on the existence or expectation" that the Mountain Air connection will be built. (R298) The Platting Board's consideration of such findings in approving S12599 is evidence of bias in favor of Mr. Spinelli.

182.    The Platting Board's actions are evidence of its members' bias in favor of Mr. Spinelli. For example, the Platting Board directed Ms. McGillivray to participate in deciding S12599 despite her personal relationship with Mr. Spinelli's family and the Platting Board's vote against her participation in S12575.

183.    The Platting Board's selective use of NFPA standards in approving S12599 is evidence of its members' bias in favor of Mr. Spinelli. For example, the Platting Board ignored NFPA 1141 Section 5.1.4.1.

184.    The Platting Board's selective use of IWUIC forms and provisions in approving S12599 is evidence of its members' bias in favor of Mr. Spinelli. For example, the Platting Board ignored IWUIC Section 402.1.1.

185.    The Board of Adjustment members who denied Plaintiff's appeal consisted of Mr. Deak, a landscape architect; Mr. Guetschow, an attorney who practices real estate law; and Mr. Stewart, an attorney who worked for Anchorage for over 11 years as a director or deputy director. (Hereafter, Mr. Deak, Mr. Guetschow, and Mr. Stewart are referred to as the Board of Adjustment members.) Developers' interests and the majority of the Board of Adjustment members' financial, professional, and personal interests are aligned. The majority of the Board of Adjustment members' livelihoods and professional and personal interests created a substantial probability that they were biased in favor of Mr. Spinelli. Their livelihoods and interests created the appearance of impropriety in the proceeding. Their livelihoods and interests diminished the public trust.

186.    Mr. Deak is a principal landscape architect at KPB Architects. He has worked with Mr. Spinelli on various Anchorage projects, including on the Housing and Neighborhood Development Commission (where Mr. Deak was the chair and Mr. Spinelli was the vice chair) and on the Anchorage Housing Market Analysis Technical Advisory Committee.

187.    The Board of Adjustment unanimously denied Plaintiffs' appeal of S12599. Denying Plaintiffs' appeal of S12599 was in the business interests of at least the majority of the Board of Adjustment. There is a substantial probability that their judgment was affected by the fact that granting the appeal would have adversely affected their chances of doing business with Mr. Spinelli. There is a substantial probability that their judgment

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 56 of 77

was affected by the fact that granting the appeal would have adversely affected their chances of doing business with entities he is financially associated with. There is a substantial probability that their judgment was affected by the fact that granting it would adversely affected their chances of doing business with others involved in the real estate industry. There is a substantial probability that their judgment was affected by the fact that their jobs and income—like Mr. Spinelli's—are or were closely related to real estate development.

188.    The Board of Adjustment members did not represent that denying Plaintiffs' appeal of S12599 would not adversely affect them financially or professionally or adversely affect the companies they and their spouses work for.

189.    Reducing the probability of bias in favor of developers serves Anchorage's interests by making Platting Board and Board of Adjustment decisions fairer and by improving the public trust.

190.    Anchorage can reduce the probability of bias in favor of developers through implementing measures such as the following that would impose no or, at most, minimal costs and administrative burdens on Anchorage:

> a.    transfer Platting Board decision-making regarding preliminary plats and variances to an Anchorage agency, such as the Planning Department, and provide an opportunity for public comment to that agency before a decision is made;

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 57 of 77

b.        ensure Board of Adjustment members' livelihoods are not dependent on pro- or anti-development entities, or transfer Board of Adjustment decision-making regarding appeals of approvals or denials of preliminary plats and variances to an Anchorage agency, such as the Administrative Hearing Office;

c.        before the Planning Department makes its final recommendation to the Platting Board, provide the public an opportunity to review and comment on the records compiled by the Planning Department, including other Anchorage agencies' comments on the application, and on the Planning Department's preliminary analysis of the application; and provide the public an opportunity to present written questions to the applicant, the Planning Department, and other municipal agencies and require written responses to those questions;

d.        ensure the Platting Board has enough time to consider the material submitted to and/or developed by the Planning Department, other municipal agencies, and the public regarding the application before deciding the application; and

e.        not impose costs to appeal Platting Board approvals of applications, for example, by including the cost of appeals in the cost of processing applications. Developers are not charged for the work municipal agencies perform assisting them in preparing (as opposed to reviewing) their applications, and

developers are the persons seeking to change the status quo to financially profit on their investments.

191. The costs that Anchorage imposes on Appellants—i.e., an appeal fee of $1,080 (regardless of the size or complexity of the appeal), the cost of transcribing the hearing, $1.70 per page for the record (including even the transcript that Appellants paid for), and $40 per hour to compile the record—constitute bias in favor of Mr. Spinelli and other developers. Anchorage provides no justification for these costs. These costs are excessive and arbitrary. These costs discourage residents from appealing Platting Board decisions. Residents affected by a proposed development typically lack developers' financial resources to pay the costs that the Municipality imposes to appeal a Platting Board decision.

192. Given the Platting Board's and the Board of Adjustment's members' probability of bias in favor of developers, Anchorage treats developers better than residents: i.e., matters before the Platting Board and Board of Adjustment where the interests of developers and residents conflict are more likely to be decided in favor of developers than residents.

193. The appeal process reduces the probability that the Board of Adjustment overturns Platting Board decisions. For example, the Platting Board's factual findings include implied findings. For example, the Platting Board's findings are considered true even if only supported by "adequate" evidence. For example, the Board of Adjustment

may overturn the Platting Board on disputed issues or findings of fact only by unanimous vote. Given the Platting Board's members' probability of bias in favor of developers and the appeal process, Anchorage treats developers better than residents.

194. No grounds exist for the Platting Board's and the Board of Adjustment's preferential treatment of developers over residents.

195. Pro-developer bias on the Platting Board and the Board of Adjustment serves no legitimate state interest.

196. Anchorage has a custom or usage of appointing members to the Platting Board and Board of Adjustment with a substantial probability of being biased in favor of developers.

197. In addition to the Platting Board members who decided S12599, the other current Platting Board members are Ricardo L Castillo, Ryan M. Morman, Ms. Weltzin, and Zach James Young.

198. Mr. Morman is a manager at Anchorage Sand & Gravel. Anchorage Sand & Gravel sells building materials to Anchorage real estate developers.

199. Ms. Weltzin is the principal owner of JDW counsel. She practices real estate law, including acquisition, development, land use and zoning, and use permits.

200. Mr. Zach Young is a real estate professional at Real Estate Brokers of Alaska.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 60 of 77

201.    In addition to the Platting Board members who decided S12599, former Platting Board members include Christina Eneix, Ms. Lipson, and Daniel Young.

202.    Ms. Eneix is the president and chief executive officer of Green Earth Landworks, LLC, a company that specializes in commercial, civil, and residential landscaping.

203.    Ms. Lipson represented Mr. Spinelli before the Board of Adjustment on the appeal of S12599. She was on the Platting Board when it approved S12420. The S12420 application states that "the property will be developed by Spinell" (R442, R444), that the petitioner is "Andre Spinelli" (R459), and that questions should go to "Andre Spinelli" (R461). The S12420 records include an Affidavit of Posting in which Mr. Spinelli certified that he petitioned for approval of S12420. The Records also include an option for Spinell to purchase the Property. Ms. Lipson resigned from the Platting Board. Her participation on the Platting Board ended on August 19, 2021. Ms. Lipson and her law firm, Ashburn and Mason, P.C., represent Spinell in various matters. Spinell and Mr. Spinelli benefitted from the approval of S12420.

204.    Mr. Daniel Young is the president and chief executive officer of TERRASAT, Inc., which provides geological and environmental services in such areas as land development, stormwater management, ground water exploration, aquifer protection, environmental site assessment, hazardous waste remediation, and underground storage

tank closure. TERRASAT provides services to, among others, owners of residential subdivisions and commercial property.

205. Former Board of Adjustment member Dwayne Adams is a landscape architect. He is or was a senior landscape architect at Earthscape, LLC.

206. Developers, including Spinell, and Anchorage residents, including Plaintiffs, own real estate in Anchorage.

207. Developers, including Mr. Spinelli and Spinell, use their property as an investment to make a profit.

208. Residents, including Plaintiffs, use their property as a place to shelter themselves and their families.

209. Mr. Spinelli, Spinell, and Mission are not guaranteed a profit or even to avoid a loss on their investment. Nothing required them to purchase the Property, and they purchased it knowing about the phased construction and other conditions and about the legal requirements intended to protect lives and property.

210. There is a substantial probability that the Platting Board gives better treatment to developers, including Mr. Spinelli and Spinell, than to Anchorage residents, including Plaintiffs.

211. There is a substantial probability that the Platting Board's decision in S12599 was the result of giving better treatment to Mr. Spinelli and Spinell than to Plaintiffs.

212.    No evidence in the Record shows that the Planning Department considered the effect of adding 27 houses to the area above Luna without a secondary access road on the property values of the existing houses or lots platted for houses above Luna.

<u>Injury to Plaintiffs</u>

213.    Plaintiffs have owned and resided at 15830 Far View Place, Anchorage, Alaska (parcel 020-043-05-000), since 2005. This is their sole residence.

214.    Plaintiffs' property abuts Anchorage parcel 020-043-03-000.

215.    There will be only one street out of and into the proposed subdivision. This street intersects with the only street (Far View) by which Plaintiffs can leave or access their home. Far View dead ends at Plaintiffs' home. Plaintiffs must go through the intersection between the one street out of and into the proposed subdivision and Far View to leave or access their home. Far View intersects with only one street (Sandpiper). Other dead end streets intersect with Sandpiper, which becomes Wind Song, which dead ends where it intersects with 156th Avenue, which dead ends in both directions after the intersection with Wind Song. Wind Song becomes 162nd Avenue at the intersection with Luna.

216.    Without a secondary access road, Plaintiffs' lives and property are at risk. Without a secondary access road, Plaintiffs will live in fear for their lives.

217.    The approval of S12599 increases the risk to Plaintiffs' lives and property. For example, it increases the risks to Plaintiffs' lives and property in the event a wildfire

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 63 of 77

requiring their evacuation. Adding 27 houses to the area above Luna increases the risk of a wildfire. Anchorage has recognized that as "development increases in areas with high wildfire potential, the chances of wildfire also increase." (R130) The Record includes no data or calculations that show that the proposed development—even with the proposed private water system—will not increase the risk to Plaintiffs' lives and property in the event of a need to evacuate their home.

218.    The approval of S12599 places Mr. Spinelli's, Spinell's, and Mission's monetary interests above the lives and property of the hundreds of residents above Elizabeth, including Plaintiffs.

## CLAIMS

### Count One

219.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

220.    Under AMC 23.45.D107.1 and under AMCR 21.90.003(F)(3)(b) and AMCR 21.90.003(F)(3)(c), residential developments containing at least 30 dwelling units must have at least two fire apparatus access roads approved by the fire code official unless the fire code official determines that more than one such road will be built.

221.    More than 30 dwelling units already exist on the single access road that would connect with the proposed development, and no basis exists for a determination that at least two approved fire apparatus access roads will exist.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 64 of 77

222.    AMCR 21.90.003(F)(3)(b) and AMCR 21.90.003(F)(3)(c) would not apply if the municipal engineer, under AMCR 21.90.003(C)(5), and the municipal traffic engineer, under AMCR 21.90.003(D)(3), approved a waiver. No waiver was sought, and no waiver was approved.

223.    The Platting Board's approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMC 23.45.D107.1, AMCR 21.90.003(F)(3)(b), and AMCR 21.90.003(F)(3)(c).

Count Two

224.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

225.    Under AMC 21.03.200(C)(9), the Platting Board may approve a preliminary plat only upon finding that the plat conforms to AMC 21.07.060(D)(3)(d), which provides that developments containing more than 100 homes and lots platted for homes must have access to at least four public streets, unless the decision-making body determines otherwise based on whether such access is reasonably feasible given topography, natural features, and the configuration of adjacent developments.

226.    More than 100 homes and lots platted for homes exist in the area that includes the proposed development, and these homes and lots platted for homes have access to only one public street. Connecting these homes and lots platted for homes to at least one additional public street is reasonably feasible given topography, natural features, and the configuration of adjacent developments. Therefore, the Platting Board's

approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMC 21.07.060(D)(3)(d).

227.    Under AMC 21.03.200(C)(9), the Platting Board may approve a preliminary plat only upon finding that the plat conforms to AMC 21.08.030(F)(6)(a), which provides that cul-de-sacs cannot exceed 900 feet, unless the Platting Board determines that each of the criterion in AMC 21.03.240(G)(3) is met, including AMC 21.03.240(G)(3)(b), which provides that granting a variance to AMC 21.08.030(F)(6)(a) will not harm the public welfare or other property in the area that includes the proposed development.

228.    The proposed development includes a cul-de-sac that exceeds 900 feet in length. In S12420, the Platting Board approved a variance allowing this cul-de-sac subject to the phased construction condition that S12599 eliminates. Therefore, without the phased construction condition, AMC 21.03.240(G)(3)(b) was not met, and the Platting Board's approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMC 21.08.030(F)(6)(a).

229.    Under AMC 21.03.200(C)(9), the Platting Board may approve a preliminary plat only upon finding that the plat, to the maximum extent feasible, accomplishes the following: AMC 21.03.200(C)(9)(a), which requires the plat promotes the public health, safety, and welfare; AMC 21.03.200(C)(9)(b), which requires the plat mitigates the incompatibilities (e.g., regarding traffic) between residential densities in the

Case 3:22-cv-00007-SLG    Document 1    Filed 01/10/22    Page 66 of 77

proposed development and in the surrounding neighborhood; AMC 21.03.200(C)(9)(c), which requires the plat provides for efficient movement of vehicular traffic; AMC 21.03.200(C)(9)(g), which provides the plat provides access for firefighting apparatus; and AMC 21.03.200(C)(9)(k), which provides the plat furthers the goals of the Hillside District Plan, which include providing emergency access and egress.

230. The Platting Board's approval of S12599 and the Board of Adjustment's denial of Plaintiffs' appeal—i.e., thereby permitting the addition of 27 homes to an area where over a hundred homes and lots platted for homes are served by a single, narrow, winding, hazardous, approximately 1.5 mile-long road and removing the phased construction, automatic sprinkler system, and Firewise construction and landscaping techniques conditions—violated the requirement to accomplish the goals of AMC 21.03.200(C)(9)(a), AMC 21.03.200(C)(9)(b), AMC 21.03.200(C)(9)(c), AMC 21.03.200(C)(9)(g), and AMC 21.03.200(C)(9)(k) to the maximum extent feasible.

231. The Platting Board's approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMC 21.03.200(C)(9).

<u>Count Three</u>

232. Plaintiffs hereby incorporate and restate all preceding paragraphs.

233. Under AMCR 21.90.003(F)(3)(a), dead-end streets can have hydrants only if they are cul-de-sacs approved by the traffic engineer and the Fire Department.

234. The traffic engineer did not approve the cul-de-sacs with hydrants.

235. AMCR 21.90.003(F)(3)(a) would not apply if the municipal engineer, under AMCR 21.90.003(C)(5), and the municipal traffic engineer, under AMCR 21.90.003(D)(3), approved a waiver. No waiver was sought, and no wavier was approved.

236. The Platting Board's approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMCR 21.90.003(F)(3)(a).

<u>Count Four</u>

237. Plaintiffs hereby incorporate and restate all preceding paragraphs.

238. Under AMC 1.15.060(B) and under AMCR 21.11.306(C)(3), Platting Board and Board of Adjustment members must not participate in deciding any matter where, given their private relationships or interests, their participation would diminish the public trust.

239. Under AMCR 21.11.306(C)(2), Platting Board and Board of Adjustment members must not participate in deciding any matter where their or their immediate family could foreseeably profit in any material way because of their decision.

240. All members of the Platting Board who approved S12599 and the majority of the members of the Board of Adjustment who denied Plaintiffs' appeal of S12599 work and/or have spouses who work in the real estate industry. These members' participation in deciding S12599 and deciding Plaintiff's appeal of S12599 diminished

the public trust. These members or their immediate family could foreseeably profit in a material way by approving S12599 and denying Plaintiffs' appeal of S12599.

241.     At least one Platting Board member who voted to approve S12599 has a private relationship with members of Mr. Spinelli's family. This member's participation in deciding S12599 diminished the public trust.

242.     The Platting Board's approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMC 1.15.060(B), AMCR 21.11.306(C)(2), and AMCR 21.11.306(C)(3).

Count Five

243.     Plaintiffs hereby incorporate and restate all preceding paragraphs.

244.     Under AMCR 21.11.302(C), at Platting Board hearings, interested persons have a right to question the Planning Department staff and any testifier.

245.     Plaintiffs were not given an opportunity question the Planning Department staff or any testifier.

246.     The Platting Board's approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMCR 21.11.302(C).

Count Six

247.     Plaintiffs hereby incorporate and restate all preceding paragraphs.

248.     Under AMCR 21.11.304(A), the reasons for every Platting Board decision must be based on findings of fact that are supported in the record.

249. The Record does not support all the Platting Board's findings of fact in S12599, nor do the Platting Board's findings of fact support its approval of S12599.

250. The Platting Board's approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMCR 21.11.304(A).

## Count Seven

251. Plaintiffs hereby incorporate and restate all preceding paragraphs.

252. The Platting Board's approval of S12599 and the Board of Adjustment's denial of Plaintiffs' appeal of S12599 violated AMC 21.03.020.

253. Under AMC 21.03.020(F)(1), the Platting Board may not approve a preliminary plat application if the application is incomplete.

254. Under AMC 21.03.020(F)(2) and AMC 21.03.020(D)(1), an application is not complete unless the agent filing the application provides Anchorage written documentation that the agent was authorized by the owner of the property to represent the owner in filing the application.

255. The Record includes no evidence that Mr. Hoffman or Mr. Spinelli is an authorized agent of Mission or Spinell.

256. Under AMC 21.03.020(F)(2), an application is not complete unless, under AMC 21.03.020(B)(2)(a), a pre-application conference was held; under AMC 21.03.020(B)(2)(b), the applicant received written notification of the conclusions;

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 70 of 77

and, under AMC 21.03.020(B)(4)(c), the applicant received a checklist identifying the topics discussed.

257.    The Record includes no evidence that a pre-application conference occurred, that Mr. Spinelli received written notification of the conclusions, or that Mr. Spinelli received a checklist identifying the topics discussed.

258.    Under AMC 21.03.020(F)(2), an application is not complete unless the applicant provides information that public notice of the community meeting, required under AMC 21.03.020(C)(2)(a) and AMC 21.03.200(C)(3), was mailed as required by AMC 21.03.020(C)(4) and AMC 21.03.020(H)(3).

259.    The Record includes no evidence that Mr. Spinelli mailed public notice of the community meeting as required under AMC 21.03.020(C)(4) and AMC 21.03.020(H)(3).

260.    Under AMC 21.03.020(F)(2), an application is not complete unless, under AMC 21.03.020(C)(6), the applicant submits a summary of the community meeting to the director and relevant community council within seven days after the meeting; under AMC 21.03.020(C)(6)(b), the summary includes the content and dates of mailing and the number of mailings; and, under AMC 21.03.020(C)(6)(c), the summary includes the correct number of people who participated in the meeting.

261.    The Record includes no evidence that Mr. Spinelli submitted a summary of the community meeting within seven days after the meeting. The Record includes no

evidence that the summary includes the content and dates of mailing and the number of mailings. The Record includes no evidence that the summary includes the correct number of people who participated in the meeting.

262.    Under AMC 21.03.020(F)(2) and AMC 21.03.020(E)(2), an application is not complete unless it is submitted in the required form and with the supporting materials specified in the Title 21 User's Guide.

263.    The Record includes no evidence that the S12599 application was submitted in the required form and with the supporting materials specified in the Title 21 User's Guide.

264.    Under AMC 21.03.020(F)(2), AMC 21.03.020(E)(3), and AMCR 21.20.003, an application is not complete unless it is accompanied by the applicable fee.

265.    The Record includes no evidence that the S12599 application was accompanied by the applicable fee.

266.    Under AMC 21.03.020(F)(3), an application is not complete if it includes false or misleading information.

267.    The S12599 application includes false and misleading information.

268.    The Platting Board's approval of S12599 and the Board of Adjustments' denial of Plaintiffs' appeal violated AMC 21.03.020(F)(1), AMC 21.03.020(F)(2), AMC 21.03.020(F)(3), AMC 21.03.020(D)(1), AMC 21.03.020(B)(2)(a)-(b),

AMC 21.03.020(B)(4)(c), 21.03.020(C)(4), AMC 21.03.020(C)(6),

AMC 21.03.020(E)(2), AMC 21.03.020(E)(3), AMC 21.03.020(H)(3), and AMCR

21.20.003.

Count Eight

269.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

270.    The Due Process Clause of the Fourteenth Amendment of the United States

Constitution prohibits states from depriving persons of life, liberty, or property without

due process of law.

271.    Approval of S12599 and denial of Plaintiffs' appeal of S12599 jeopardize

Plaintiffs' lives and property.

272.    Anchorage has a custom or usage of appointing Platting Board and Board

of Adjustment members whose financial, professional, and personal interests align them

with and bias them in favor of the profits of developers, including Mr. Spinelli and

Spinell, over the lives and property of residents, including Plaintiffs.

273.    Anchorage's codes and regulations establish a bias in favor of Platting

Board decisions in the administrative appeal process.

274.    Anchorage's codes and regulations establish a bias in favor of the profits of

developers over the lives and property of residents.

275.    The application of Anchorage's codes and regulations establish a bias in

favor of the profits of developers over the lives and property of residents.

276.    The Platting Board's members who approved S12599 were biased in favor of developers.

277.    The majority of the Board of Adjustment's members who denied Plaintiffs' appeal of S12599 were biased in favor of developers.

278.    No compelling government interest, no important government interest, and no rational basis exist for favoring the profits of developers over the lives and property of residents.

279.    The Platting Board's approval of S12599 and the Board of Adjustment's denial of Plaintiffs' appeal of S12599, both in violation of Anchorage law, violated Plaintiffs' constitutional right to due process because they resulted from official policy, custom or usage, codes, regulations, and/or decision-making bodies that favor the interests of developers over those of residents.

<u>Count Nine</u>

280.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

281.    The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits states and municipalities from denying any person within its jurisdiction the equal protection of the laws.

282.    Plaintiffs have fundamental rights to their lives and property.

283.    Anchorage residents, including Plaintiffs, and Anchorage developers, including Mr. Spinelli and Spinell, are similarly situated as owners or representatives of owners of property on the Anchorage Hillside.

284.    Anchorage has a custom or usage of appointing Platting Board and Board of Adjustment members whose financial, professional, and personal interests align them with and bias them in favor of the profits of developers over the lives and property of residents.

285.    Anchorage's codes and regulations establish a bias in favor of Platting Board decisions in the administrative appeal process.

286.    Anchorage's codes and regulations establish a bias in favor of the profits of developers over the lives and property of residents.

287.    The application of Anchorage's codes and regulations establish a bias in favor of the profits of developers over the lives and property of residents.

288.    The Platting Board's members who approved S12599 were biased in favor of developers.

289.    The majority of the Board of Adjustment's members who denied Plaintiffs' appeal of S12599 were biased in favor of developers.

290.    No compelling government interest, no important government interest, and no rational basis exist for favoring the profits of developers over the lives and property of residents.

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 75 of 77

291. The Platting Board's approval of S12599 and the Board of Adjustment's denial of Plaintiffs' appeal of S12599, both in violation of Anchorage law, violated Plaintiffs' constitutional right to equal protection because they resulted from official policy, custom or usage, codes, regulations, and/or decision-making bodies that favor the interests of developers over those of residents.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. a declaration that the Platting Board's approval of S12599, that the Board of Adjustment's denial of Plaintiffs' appeal of S12599, that Anchorage's official policy, custom or usage, and codes and regulations, and that the application of Anchorage's codes and regulations as alleged herein are unlawful;

2. an order enjoining Defendants from engaging in the unlawful acts complained of herein;

3. compensatory damages for Plaintiffs in an amount to be determined at trial;

4. attorneys' fees and costs pursuant to 42 U.S.C. § 1988, Alaska Rule of Civil Procedure 82, and other laws against all Defendants; and

5. such other and further relief as this Court deems just and proper.

Dated: January 10, 2022                    Respectfully submitted,

s/ Alan Birnbaum
Alan Birnbaum, Alaska Bar No. 605007
Attorney for Plaintiffs

Case 3:22-cv-00007-SLG   Document 1   Filed 01/10/22   Page 76 of 77

## JURY DEMAND

Plaintiffs hereby demand a jury trial in the within-entitled action.


Dated: January 10, 2022                    Respectfully submitted,


                                           s/ Alan Birnbaum
                                           Alan Birnbaum, Alaska Bar No. 605007
                                           Attorney for Plaintiffs